<pre>
 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF TENNESSEE
 2                  NASHVILLE DIVISION

 3

 4   UNITED STATES OF AMERICA      )
                                   )
 5   VS                            )   No. 3:14-cr-00082-1
                                   )
 6   R.C. PATEL                    )
     _____
 7

 8   BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

 9              TRANSCRIPT OF PROCEEDINGS

10                  March 18, 2016

11   _____

12   APPEARANCES:

13   For the Government:      WILLIAM FRANCIS ABELY, II
                              Asst. U.S. Attorney
14                            110 Ninth Ave S., Suite A961
                              Nashville, TN 37203
15
     For the Defendant:       EDWARD T.M. GARLAND
16                            DONALD F. SAMUEL
                              Garland, Samuel & Loeb
17                            3151 Maple Drive, NE
                              Atlanta, GA 30305
18
                              HAL D. HARDIN
19                            211 Union Street
                              Suite 200
20                            Nashville, TN 37201

21   _____

22   **Roxann Harkins, RPR, CRR**
     Official Court Reporter
23   801 Broadway, Suite A837
     Nashville, TN 37203
24   615.403.8314.
     roxann_harkins@tnmd.uscourts.gov
25
</pre>

1

2          The above-styled cause came to be heard

3    on March 18, 2016, before the Hon. Aleta A. Trauger,

4    District Judge, when the following proceedings were

5    had at 3:00 p.m. to-wit:

6

7          THE COURT:  Good afternoon.  We're here

8    on sentencing in United States versus RC Patel.  We

9    have William Abely for the government.  For the

10    defendant we have Hal Hardin and Edward Garland from

11    Atlanta.  Hello.  And Donald Samuel from Atlanta.

12          MR. SAMUEL:  Good afternoon.

13          THE COURT:  Good afternoon.  It looks as

14    though there are no issues with the guidelines or

15    objections to the presentence report; is that right?

16          MR. GARLAND:  Correct.

17          THE COURT:  Who's going to speak for the

18    defense?

19          MR. GARLAND:  Mr. Samuel.

20          MR. SAMUEL:  I'm going to start,

21    Your Honor.

22          THE COURT:  Is that right, Mr. Samuel?

23          MR. SAMUEL:  I will start, Your Honor.

24    Yes.

25          THE COURT:  Okay.  So I'm going to accept

1    the presentence report as my findings of fact on all

2    issues and on the application of the guidelines.  The

3    offense level is a 16.  The criminal history category

4    is I.  The resulting guideline range is 27 to -- 21 to

5    27 months, sorry about that, with one to three years

6    of supervised release.

7              Mr. Patel pled guilty under the previous

8    judge assigned to this case, Judge Haynes, back in

9    July under a plea agreement that allowed him to plead

10   to two counts of wire fraud and called for the

11   dismissal by the government at sentencing of three

12   more counts of wire fraud, a count of mail fraud and

13   four counts of money laundering.

14              Is that right, Mr. Abely?

15              MR. ABELY:  That is correct, Your Honor.

16              THE COURT:  All right.  Are there any

17   witnesses?  The defense has submitted a lengthy

18   sentencing memorandum, including videos.  I've read

19   all of it and watched the videos.  The government has

20   responded at length to the lengthy submittal by the

21   defense.

22              Are there any witnesses from the

23   government?

24              MR. ABELY:  We do not have any witnesses.

25              THE COURT:  Do you have any witnesses,

1    any victims here to testify?

2                MR. ABELY:  My understanding is there are

3    no victims here to testify.  I was under the

4    understanding that the victim, Mr. Kisan, would be

5    here; although, I'm not certain that he is.

6                THE COURT:  Okay.  I've read the victim

7    statements.

8                Does the defense have any witnesses,

9    Mr. Samuel?

10               MR. SAMUEL:  We do not.

11               THE COURT:  Okay.  Well, I'm ready to

12   hear whatever further anyone wants to say.  Does the

13   government wish to go first or do you wish to go

14   second?

15               MR. ABELY:  I'm happy to go first,

16   Your Honor.

17               THE COURT:  All right.

18               MR. ABELY:  And I'll rely primarily on my

19   written submission, my sentencing memorandum.  And I

20   don't want to retread that too much, but I did just

21   want to emphasize a couple of points in this,

22   primarily, I think, relevant to Your Honor in

23   connection with the nature and seriousness of the

24   offense.  You know, I understand some of the points

25   that the defense has made about this deal gone wrong.

1    And I think it's open to debate whether Mr. Patel

2    intended from the outset to permanently deprive the

3    victim of these funds.

4               I think they will make a case and I think

5    there are facts that favor their case that that's not

6    the case.  That he went into this without that

7    intention to permanently convert this money, always

8    intending to either use it for the deal or return it.

9    And I understand that point that they're making.

10              Counterbalancing that, though, I would

11   just argue that this is not as simple as a deal that

12   didn't go through.  What we have here is a deal that

13   was proposed to the victim, certainly without all of

14   the relevant information being disclosed.  The deal

15   involved an auction on a mortgage.

16              THE COURT:  That was never going to be in

17   the individual's name.

18              MR. ABELY:  That's right.  Mr. Patel --

19              THE COURT:  It was the bank.

20              MR. ABELY:  -- never put in a bid on

21   this.  Mr. Patel was an executive and part owner at a

22   bank that did.  But it's certainly unclear whether

23   even if the bank had won that bid, if the victim would

24   have been entitled to any interest in that mortgage,

25   any profit from that mortgage.  The CEO of the bank

1    who testified indicated, no, no, if the bank had won

2    this auction, it would have been the bank's mortgage

3    and the profit that accrued from that would have gone

4    to the bank.

5             THE COURT:  And I think the banker said

6    in the grand jury testimony that these were never kind

7    of joint endeavors with individuals.

8             MR. ABELY:  That's right.  That is what

9    he said.  He was not aware of any sort of side

10   arrangements involving Mr. Patel and any outside

11   investors.  His understanding was when the bank bid on

12   a property, if the bank won it, the bank used its

13   money and then had the investment as the bank's

14   investment.

15            And, you know, I acknowledge that those

16   facts are not something that the defendant pled to in

17   his plea agreement, but I do think the grand jury

18   testimony provides an adequate basis upon which the

19   Court could conclude that either that this whole

20   notion of the deal through this auction was either a

21   sham or at least that it's unclear how Mr. Patel would

22   have made good on the deal as he had proposed.

23            THE COURT:  Well, at the plea hearing he

24   had to admit the intent to defraud.

25            MR. ABELY:  Yes.

1        THE COURT:  And as I did not take the

2    plea, I presume he admitted the intent to defraud.

3        MR. ABELY:  Yes.  And I think that goes

4    to -- back in the realm of the facts that are not

5    disputed.  And that's that the same day he took that

6    money and used it for an unrelated purpose.

7        I think Mr. Patel would probably say --

8    or his counsel would likely argue that he did that --

9    he didn't use the victim's money as he promised, but

10   he intended to make him whole at some point in time.

11   And I think, again, given the bank's CEO's testimony,

12   the facts around that are unclear.

13       The other point I wanted to make is just

14   the defense notion that this is something that was

15   remedied, you know, right away is not quite the case.

16   The victim -- I'm sorry, the defendant, in addition to

17   misrepresenting the status of the auction to the

18   victim, that same month in December of 2008 continued

19   those misrepresentations.

20       A civil lawsuit commenced, and during a

21   sworn deposition in that, again, Mr. Patel indicated

22   that they had either won the bid or -- so things were

23   more complicated than what really happened, which is

24   either that no bid was placed or that the bid that was

25   placed was unsuccessful just sort of ending it right

1   there.  So I think the misrepresentations that go
2   along with this fraud were not confined in nature to
3   just that period in December 2008.
4          Now, I will say in the defendant's favor,
5   you know, upon being confronted by the victim, the
6   defendant acknowledged that he did owe this $500,000
7   back to the victim.  Litigation did commence, which I
8   understand was somewhat contentious in nature.  There
9   were attempts to resolve it that, through no fault of
10  Mr. Patel potentially, you know, they dragged on in
11  time.
12         In other words, I don't refute the
13  defense's submission that Mr. Patel wanted to make
14  restitution to this at a fairly early stage and sought
15  to do so.  And ultimately he did.  He did.  The
16  defense characterizes that in its paper as an
17  extraordinary -- extraordinary restitution.  I'm not
18  sure that's the case.
19         I'm not sure I would quite put this in
20  the same bucket as somebody entirely voluntarily
21  making restitution.  Here it was in connection with a
22  settlement of a federal lawsuit.  So voluntary on one
23  hand but not entirely on the other.
24         THE COURT:  Was the restitution payment
25  after these charges were brought?

1            MR. ABELY:  That is correct, Your Honor.

2    That is correct.  Although I don't necessarily

3    attribute it one way or the other.  I don't think any

4    of us could know.

5            So that's all just going into the offense

6    conduct.  And I think that that is a large driving

7    factor in the appropriate sentence in this case.  I do

8    want to point out the government does seek to dismiss

9    Counts Three through Ten.

10           The -- there was a separate transaction

11   alleged in some of those counts that the parties have

12   agreed the presentence report reflects is not part of

13   the relevant conduct.  I think that is accurate, I

14   think that was a separate deal.

15           I think there were proof issues

16   associated with that such that it really is not part

17   of -- it was the same -- the victim was the same

18   person who was involved in that transaction, but I

19   think the appropriate way to look at the sentencing in

20   this case is to focus on that $500,000 transaction.

21           And I think that the seriousness of this

22   offense, as well as the need for general deterrence, I

23   mention in my papers the seriousness of investor fraud

24   in general, the harm that that can bestow on

25   individuals and it does bestow on individuals is a

1   very serious thing, so I think the general deterrence

2   is a serious factor that should play into the Court's

3   consideration.

4          Now, I've also obviously read the letters

5   that were submitted on behalf of the defendant and

6   watched the videos, and I think it is fair to say that

7   Mr. Patel has made a positive impact in a lot of

8   peoples' lives, that he has made contributions to his

9   community.

10         I think that is something that is

11   obviously fair and necessary for the Court to consider

12   in imposing a sentence in this case.  I will say the

13   letters submitted on behalf of Mr. Patel maybe are not

14   the whole story.  There are obviously this victim and

15   others who have had disputes in their dealings with

16   Mr. Patel.

17         But I think when looking at the whole

18   picture, it's appropriate for the Court to consider

19   the contributions that he's made as reflected in these

20   letters.  And that's why, Your Honor, the government

21   has proposed a sentence in the case that is slightly

22   below the guideline range.

23         The guideline range, as Your Honor noted,

24   is 21 to 27 months.  The government would suggest a

25   sentence of 18 months, which is below -- not too far

1    below, but below the low end of that guideline range.

2    I think in consideration of some of the factors, the

3    contributions that Mr. Patel has made, the fact that

4    may not be an acute need for personal deterrence as to

5    him, and the fact that he doesn't have any previous

6    criminal history and that kind of thing.

7            And in addition to that, Your Honor, the

8    government's asked for a fine of $50,000, which is

9    within the guidelines but I think right at the high

10   end of the fine guidelines.

11           And lastly, Your Honor, I would just

12   point out that within Mr. Patel's sentencing papers,

13   there are certain arguments regarding his adult son

14   who apparently has suffered from some issues in his

15   life.

16           I would submit to the Court, though, it

17   does not appear that these issues are of a

18   debilitating nature.  This is an adult son who I

19   understand to have been married and employed, who

20   lives at Mr. Patel's home along with not just his wife

21   but his other adult children.

22           So I don't think this is one of the

23   instances that I know sometimes confronts the Court

24   where the notion of imprisonment of a defendant would

25   seriously jeopardize the caregiving of somebody who

1    needs caregiving.  I don't dispute that there are some

2    issues that Mr. Patel's son has and continues to have

3    to deal with, but, again, he's an adult and these do

4    not seem to be what I would characterize as severe

5    issues that would require the sort of full-time

6    caregiving.

7              That's all I have.  Thank you.

8              THE COURT:  Has the government looked

9    into -- I mean, there are tens of lawsuits listed as

10   an attachment to the presentence report that have been

11   brought against this defendant and his entities.

12   There must be, I don't know, close to 60, 70 lawsuits

13   in the last several years.  I have dispositions on

14   about a third of them.  I don't have dispositions on

15   the rest of them.

16             Has the government looked into any of

17   these?  I questioned the probation officer this

18   morning about it, and she said her initial research

19   had indicated that many of these were complaints based

20   upon fraudulent transactions alleged against the

21   defendant.  Have you looked into those?

22             MR. ABELY:  Your Honor, I have looked at

23   some of these lawsuits.  I cannot represent I've

24   looked at all of them because there are a big number,

25   but I've familiarized myself with some of the

1    allegations in the lawsuits.  You know, some of which

2    are lawsuits brought by investors who might be

3    somewhat similarly situated to the victim in this

4    case.

5         I think on the one hand there's a

6    temptation to see a pattern there.  I think on the

7    other -- I think it's dangerous to read too much into

8    that because I don't think this -- either this

9    criminal case as a whole or this sentencing hearing in

10   particular is the right venue for litigating the

11   merits of these various lawsuits.  It would just be

12   too tough of a task.

13        And I also acknowledge that Mr. Patel has

14   a long history in the hotel -- I'm sorry, long history

15   in the hotel industry, as well as in the banking

16   industry.  He was involved with two banks right at the

17   crash of the market in the late part of last decade.

18        I think a lot of the litigation is

19   related to that and is not necessarily parallel to

20   this case.  And, again, I think without -- I think

21   it's just hard to take the allegations in a civil

22   complaint and to treat those as either right or wrong

23   in assessing -- in assessing his conduct.

24        I think the government's position is just

25   that it's the conduct in this case, the conduct to

1    which Mr. Patel has pled here should be front and

2    center in the Court's -- in the Court's analysis, if

3    that makes sense.

4              THE COURT:  Okay.  I think you may have

5    had some victims come in.

6              MR. ABELY:  Do you mind just giving me

7    one moment, Your Honor?

8              So, Your Honor, just for the record, I do

9    believe that Mr. Kisan is present in the courtroom.

10   He had previously indicated in my office that he

11   wished to rely on his written submission to the Court

12   and did not wish to make a statement.  I'll just sort

13   of look back and make sure that's still the case.

14             It appears to be the case.  Yes, Your

15   Honor.  Thank you.

16             THE COURT:  Thank you.  All right.

17             Mr. Samuel.

18             MR. SAMUEL:  Thank you.  Good afternoon,

19   Your Honor.  I'm Don Samuel, I practice law in Atlanta

20   with Ed Garland, who's my partner.  Let me address

21   first a couple of the comments that Mr. Abely made,

22   almost all of which I agree with.  He's too

23   reasonable.  I just told Mr. Hardin, he's too

24   reasonable.

25             THE COURT:  He's a very reasonable

1     prosecutor.  You're very lucky.

2                MR. SAMUEL:  I would much rather have an

3     AUSA like we have in Atlanta who'd exaggerate about

4     everything and make all kinds of false claims that are

5     easy to refute.  That's, unfortunately, not the case

6     with Mr. Abely.

7                Let me tell you our view of the

8     transaction first because I'm not entirely sure we

9     agree with Mr. Abely about that.  Mr. RC Patel was a

10    prominent member of High Trust Bank, which was going

11    to be submitting -- did submit the bid for the

12    mortgage on the Best Western property, which was in

13    downtown Atlanta.

14                I read Mr. Blackman's grand jury

15    testimony.  I've also spent considerable time,

16    whenever it was, two years ago talking to his lawyer

17    and interviewing him through his lawyer, so I know --

18    I also have a version of events through -- from

19    Mr. Blackman.

20                THE COURT:  And he wrote a letter on your

21    behalf.

22                MR. SAMUEL:  Right.  His view when I

23    talked to him and, again, through the lawyer -- I

24    don't want to misrepresent that I talked to him

25    directly.  He had a lawyer, Richard Hendrix, very

1   prominent lawyer in Atlanta, who appeared with him at

2   the grand jury and he asked me to go through him

3   rather than directly speaking with Mr. Blackman.

4           But I sent a set of written questions and

5   got -- received answers back from Mr. Hendrix.  Their

6   view -- Mr. Blackman's view through Mr. Hendrix was

7   that High Trust was going to bid on the mortgage,

8   expected to win the bid.  They weren't bidding low,

9   they expected to win the bid.  This was all a result

10  of Integrity Bank, one of the largest community banks

11  in Georgia, going under.  Nothing to do with us.

12          When it won the bid, it was High Trust's

13  practice not to keep the mortgage, but to simply then

14  sell it themselves.  Sometimes they would retain a

15  servicing agreement where they would then collect the

16  money from the debtor, but that they would customarily

17  sell the mortgage or flip it, if you will, to try to

18  make money on the transaction.

19          That was exactly what RC Patel envisioned

20  happening.  He was a 65 percent owner of the bank,

21  obviously a very prominent member of the bank.  What

22  he anticipated doing and Mr. Blackman, though he

23  didn't have specific conversations about this, said

24  this was, in fact, the kind of thing that High Trust

25  did is that they would then sell the mortgage to RC,

there would be an increase in the price.  That's why
High Trust was willing to do this, because they would
make an immediate profit on it.  And then they would
get the servicing agreement.

In fact, when I talked to Mr. Blackman's
lawyer, he said they had a number of conversations
with servicing agreements.  They even sent me a draft
of one that they were going to use with the Red Roof
Inn that was being bid at the same time, exact same
auction, where they had drafts of servicing agreements
where they would win the bid, win the mortgage, sell
it and then be the servicing agent.  They would then
collect the money from the debt.  So it was
profitable --

THE COURT:  Did you say sell it to the
defendant?

MR. SAMUEL:  In this case, it was going
to be to RC, that's right.  RC would purchase it.
That also explains why in Mr. Abely's argument he
says, why would he tell Mr. Kisan that it was,
whatever the numbers are, 1.2 million when, in fact --
or 1.3 million when, in fact, the bank submitted a bid
for considerably less.

The answer is that the bank was going to
sell it to RC for more.  The bank was going to make a

1    profit on the transaction.  This is what RC intended

2    as opposed to the most sinister view of things, which

3    is that there never was a mortgage, there never was

4    going to be a mortgage.  It was owned by the bank

5    which had no intention of ever partnering with

6    Mr. Kisan.

7              And Mr. Kisan knew that the bid was not

8    being made directly by RC.  We said it in our memo.

9    It's in the stipulated facts.  It's in the PSR that

10   Mr. Kisan knew it was going to be the bank making the

11   initial bid to Debt-X, which is the name of the

12   auction company.  None of this happened.

13             So it's kind of hard to say empirically,

14   this is what everybody intended because we don't

15   have -- you know, any post hoc evidence of what their

16   intent was because it didn't go through because the

17   bid didn't win.

18             The one other factor we would point out

19   to kind of support our view of what was going to

20   happen is if you look at the bid, you'll see that

21   what's known as the UPB, the unpaid -- the percentage

22   of unpaid balance has a lot of 7s at the end of it.

23             I know this sounds a little too much

24   numerology, but every time Mr. RC Patel ever buys

25   anything, he always does it with 77 cents or something

1   and adds 77 at the end.  It's his -- it's his mark of

2   Zorro, if you will, and that's what the High Trust bid

3   was in this case.

4            If you look at the exhibit attached to

5   the government's submission, Exhibit 1, you'll see

6   that the bid ends in a bunch of 7s.  The UPB price.

7   So, again, that shows RC's close involvement in the

8   decision, as well as his son, Jay Patel, which

9   Mr. Blackman also says, he was so intimately involved

10  in making this bid for the bank because he planned to

11  buy it from the bank.

12           So that's a very long answer to the

13  question, what was their intent.  The intent, RC's

14  intent was not to simply, you know, get $500,000 from

15  Mr. Kisan for some asset that never did or never would

16  exist.  I don't think that's correct.

17           THE COURT:  But the fact -- the fact

18  remains that he -- he sent that money immediately to

19  pay off a personal loan.

20           MR. SAMUEL:  That's absolutely true.

21  Same day, I believe.

22           THE COURT:  Yeah.

23           MR. SAMUEL:  And that's why there's a

24  factual basis for this here.  It's not that he was --

25  exactly what you posed initially.  There was not an

1  intent to convert the money forever.  It was
2  inappropriate, unlawful borrowing of the money, if you
3  will.  It was a misappropriation of the money, what
4  was intended to be for a very short time.
5           It was his -- he didn't know everything
6  was going to come to an end, you know, in December of
7  2008, that his bank would fail, his other bank failed
8  three or four days later.  I mean, things really
9  became chaotic very, very quickly in late '08.
10          I put in my sentencing memorandum,
11  you-all in the state of Tennessee had five bank
12  failures over the course of five years.  Heck, we were
13  having five a day, it seems like.  I mean, 75 bank
14  failures.  More in Georgia than any other state in the
15  country.
16          And it was the community banks, which
17  RC Patel was the major player in two of them, High
18  Trust and Havens Trust.  It was complete chaos.  And
19  my partner and I were involved in litigation involving
20  these.  Some criminal, some civil, representing board
21  of directors.  It dominated our -- not our practice
22  necessarily, but it was a big part of our practice.
23          And they -- Alston & Bird in Atlanta, I
24  mean, everybody -- just nobody thought it was coming
25  that bad.  And the rest of the country suffered a lot,

1   but nothing compared to what happened in Georgia.

2               So as Mr. Abely said and just about

3   everything else, I just can't fuss at him at all.  He

4   gets the 500,000, he misappropriates it.  He uses it

5   for his own personal debt, which was coming due

6   immediately.  Expected to win the auction, didn't.

7               He and Mr. Kisan have known each other

8   for 25 years, were family friends.  They end up in

9   India together at a New Year's Eve party, and by that

10  point he knows they haven't won the auction, and

11  Mr. Kisan asks what's going on and he doesn't tell him

12  the truth.  He just doesn't have -- doesn't tell him

13  the truth.

14              Within four weeks he tells Mr. Kisan that

15  I need to pay you the money back, we didn't win the

16  auction.  Some discussion about the EPA, that makes no

17  sense whatsoever.  But he's got to pay the money back.

18  And a couple weeks after that he actually brings him a

19  check and says, don't cash this.  It's not a good

20  check now, but I owe you this money.

21              Now, 35 years, I've done a lot of fraud

22  cases.  You don't generally see within eight weeks

23  someone bringing the check back saying, I did it, I'm

24  wrong, I need to give you this money back.  Please

25  give me some time to make the check good.

1          What happens after that is -- there's a
2    lawyer here in Nashville, Ernie Williams, kind of
3    represented them both over time, and within a matter
4    of months a number of documents that I've shown to
5    Mr. Abely over the years that we've been fussing about
6    in this case, Mr. Kisan says, I want you to apply that
7    $500,000 to this other transaction we did.  I want a
8    bigger percentage of the other hotel.
9          And there's letters written about that.
10   There's deposition testimony about that.  The
11   long-lasting litigation wasn't because Mr. Patel said
12   I won't pay you back or I can't pay you back.  Neither
13   of those were true.  It was because they couldn't
14   agree on a number.
15         It would have been very easy to say I owe
16   you 500 and I owe you 750, but Mr. Kisan's lawyers
17   were very aggressive lawyers.  Nothing wrong about
18   that.  It's the way civil litigators are.  And they
19   wanted more, they wanted more.
20         At one point they were asking for two
21   million.  And, you know, we want the entire -- the
22   Myrtle Beach hotel.
23         THE COURT:  Is this Ernie Williams the
24   bankruptcy lawyer or Ernie Williams the former US
25   attorney?

1          MR. GARLAND:  I think he's the bankruptcy

2    lawyer.

3          THE COURT:  Okay.

4          MR. SAMUEL:  He was not the lawyer in the

5    case.  He initially tried to negotiate between them

6    because he had represented both of them over time.  It

7    ended up being a South Carolina case with South

8    Carolina lawyers who were very, very aggressive

9    lawyers.

10         So that's what happened.  I mean, you

11   have a $500,000 case here with an attempt to pay it

12   back fairly quickly, with an almost immediate

13   acknowledgment of wrong-doing.  And then litigation

14   that prolongs it.

15         Mr. Abely mistakenly said the payments --

16   the settlement was after the criminal case.  That's

17   not accurate.  If you look in our notebook, the case

18   was settled before the indictment.  It was paid over

19   time, the final payment wasn't paid until December,

20   but the case settled before RC was indicted.

21         THE COURT:  The civil case.

22         MR. SAMUEL:  Correct.  So I think that's

23   an important fact.  Obviously you asked the question

24   and I think for good measure.  You know, people who

25   settle after being indicted, you know, how much good

can you say about that.  But people who settle before
you get indicted, you know, obviously there's an
interest in not getting indicted, but still, he
never -- and if you read the depositions from 2011,
2013, every time he's asked a question by the opposing
lawyer, do you owe this money, he said, of course I
owe the money.

I mean, I sent excerpts up to Ms. Landers
of all the deposition transcripts.  I said, he's never
denied it.  There was never any allegation of -- that,
oh, no, I'm entitled to this money or making up stuff
or -- I owe you the $500,000.

At one point the lawyer says during the
deposition, why don't you just write me a check right
now.  He says, I would.  If we could settle this case,
I'd write you a check right now.  But the lawyers
didn't want to do that.

According to Mr. Kisan's lawyer, the
lawyers charged him $500,000 for this case.  I don't
know if it's true or not.  I'm not privy to his fee
agreement, but my understanding is he ended up suing
his lawyers.  So this was just not RC's fault.  This
case should have been -- this never should have been a
criminal case.  It never should have been a civil
case.

1          They should have figured out a way to get
2    money paid back fairly quickly, just like the hundreds
3    of disputes we had in Atlanta when banks failed and a
4    lot of people were losing money quickly.
5          So it is an exceptional case.  Is it
6    exceptional restitution and, you know, like the *Kim*
7    case that we cite or the other cases where someone
8    goes out and sells his house just to make restitution,
9    no, I'm not -- we don't suggest that.  We said -- what
10   we said to you is exactly what the truth is, that he
11   always admitted, always willing to pay the money back.
12         They couldn't come to terms, and every
13   penny was paid back without the need of the FBI or the
14   US Attorney getting involved.  It wasn't that kind of,
15   you know, payment a couple weeks before sentencing.
16         So we ask you to accept -- we ask you to
17   consider that as a significant 3553(a) factor when
18   considering the nature of the offense.  It is a -- let
19   me also say, Mr. Abely said he takes issue with my
20   argument that he wasn't defrauding a bank or the
21   government.  And I get his point.
22         Obviously if you're defrauding the
23   paradigmatic little old lady that's got no money, that
24   is worse, I guess, than the bank or the government.
25   But the reason that the guidelines are higher when you

1   defraud banks and you defraud governments is because

2   they have a more difficult time protecting themselves,

3   right.  The government's just too big.  Banks, you

4   know, have to rely on the honesty of their customers.

5              Mr. Kisan is not someone without

6   resources.  He's fairly wealthy, been a very

7   successful businessman, very successful.  He didn't

8   deserve to have his money taken from him.  Not saying

9   that, but he's gotten his money back.  He's been paid

10  in full.  He's been given a certain amount of profit

11  on top of that.  Settlement was in excess of the total

12  amount of money received.

13             So that's why I put that in the brief

14  that it's not like, you know, cheating the government

15  or taking a million dollars from the bank that you

16  have no intention of paying back.

17             So we stress those facts regarding the

18  nature of the offense.  It is an unusual case, whether

19  you have cases like this up here or not all the time,

20  obviously I don't know.

21             So part two, I guess, is the enormous

22  community support, a lot of which is behind me here in

23  the courtroom today, people who feel very indebted to

24  RC for what he's done in business, with the banks.

25  His lending to other people in his community, First

1    Indian American banks in Georgia.  Very prominent in

2    the hotel industry.  You've got letters from people in

3    the hotel industry talking about, you know, helping

4    other businessmen.  His family, what he's done for his

5    family and extended members of his family, pretty

6    remarkable.

7            His whole upbringing, born in New Ghanda,

8    under Idi Amin, ending up in London, no money.  Comes

9    here, brings his family, pretty remarkable, all things

10   considered, you know, the man you're getting ready to

11   sentence here and his background.  It's an

12   extraordinary background.

13           And extraordinary things that he's done

14   with his life.  His charity, his help to other people.

15   I mean, I've known RC a long time.  I've got to tell

16   you, I'm not a witness, I'm a lawyer, but I've known

17   him and his brother Mike and other members of his

18   family.

19           I can't tell you how many years we've

20   been -- I've dealt with some of the bank cases with

21   him, civil cases with him.  Represented his brother

22   Mike in cases and Jay, who's here.  I've represented

23   in all kinds of litigation they've had.  I had no idea

24   some of this charitable stuff.

25           Doesn't that tell you something?  I mean,

1    I've known him for years and I didn't know anything
2    about all the good work he's done and the charity he's
3    done because he doesn't brag about it.  He doesn't
4    come to the office and say, you know, Mr. Samuel, I'm
5    here, but I'm going to do some charitable events and
6    you should do me something in return.  He doesn't brag
7    about it.  He just doesn't.  And I think that's a good
8    sign of his character.
9              And I'm not going to go through the
10   letters, you've read them.  There's no reason for me
11   to.  I'd add that my partner is going to introduce you
12   to the members of the public who are here without
13   having any testimony.  Mr. Hardin, who's been very
14   helpful the last couple months in this case, is going
15   to wrap up.
16             Civil litigation, you asked about that.
17   Because of our concern with that -- and Ms. Landers
18   and I talked about that a lot and I appreciate her
19   talking to me many times in preparation for the PSR.
20             I'm going to give you two-second overview
21   and tell you that the lawyer who represents RC in most
22   of the civil litigation is here and will answer any
23   question you have about specifics.  And I think it's
24   important for you to hear since it's on your mind,
25   Brian Knight is here sitting in the front here, who's

1    his lawyer in most of his little civil cases.

2            First of all, even though on a

3    spreadsheet it looks like 93 cases, if you just look

4    at the style of the case, you can see it's the same

5    case over and over and over again.  You know,

6    State Bank --

7            THE COURT:  Well, they're not tiny

8    judgments either.

9            MR. SAMUEL:  No, he's guarantor --

10           THE COURT:  We're talking about

11   multimillion-dollar judgments.

12           MR. SAMUEL:  He's a guarantor on these

13   large notes.  When he owned 200 hotels and banks, he's

14   constantly signing guaranties on loans to one of his

15   dozens and dozens of corporations that own the

16   individual hotels.  Everything goes under, everybody

17   sues you on your note.

18           In the State Bank of Texas if you just

19   look at the list, that's 10 cases.  It's all the same

20   case.  It's just being filed in DeKalb County,

21   dismissed, filed in Fulton County.  There's a federal

22   case there that Brian will tell you about where he

23   files it District Court, gets dismissed, goes to the

24   11th Circuit, back to the District Court.  Five

25   entries on the spreadsheet for the exact same case.

1          I've gone through some of those cases --

2    I was the lawyer in a couple of them, the mediation

3    with the FDIC.  There's no evidence of any fraud

4    there.  The FDIC took over Havens Trust Bank and, you

5    know, all the directors got sued.  I represented RC

6    and his brother Mike, and Alston & Bird represented

7    the other, I don't know, 20 directors.  There was no

8    fraud there there was just the FDIC trying to figure

9    out how to sort out the assets.

10         Some of these cases are slip and falls at

11   the hotel.  Some of these cases, you'll see one of

12   them's from a mold company.  One of them deals with

13   fighting over an easement to the parking lot next

14   door.  So the sheer number is a little unfair.

15         I mean, everybody said I had to mention

16   Donald Trump here.  I mean, he gets lots of lawsuits

17   too.  We do tend to settle our lawsuits, as opposed to

18   him, and a lot of these have nothing to do with any

19   allegations of fraud.

20         A couple of them do have allegations of

21   fraud.  Some of them are family members.  And I'd ask,

22   when I'm done, if Brian can stand up and just kind of

23   address the Court with regard to those.  And I am

24   about done.

25         I've told you -- again, you see all the

1  charitable work, you've seen the videos, so I don't

2  know what more I can add about that.  I think among

3  the lawyers here I know more about the facts of this

4  case than anybody else, so if you have any questions

5  about the nature of the offense or anything I've

6  talked about, probably ought to ask me rather than my

7  colleagues here because I probably know the facts a

8  little bit better.

9           But otherwise I'm going to ask Brian

10  Knight to address you with regard to the -- make sure

11  I'm not leaving anything out here quickly.

12           THE COURT:  All right.

13           MR. SAMUEL:  This is Brian Knight, also a

14  member of the Georgia bar.

15           THE COURT:  Good afternoon.

16           MR. KNIGHT:  Good afternoon, Your Honor.

17  I've been representing RC for the last 10 years, so

18  I've seen the good times when he was making a lot of

19  money, doing a lot of deals, and in '08 during the

20  crash.  And I will tell you, all of those -- I was

21  involved in almost all those cases that you've seen.

22           Out of all of those, there's only two

23  pending cases right now.  Either they've been -- we've

24  done consent judgments.  Most of those consent

25  judgments that you see are for bank notes.  He's a

1    guarantor on a bank note, property was foreclosed by

2    the bank, he's left sitting there.  And we did consent

3    judgments.  Those are the majority of the cases.  And

4    even with those judgments, we've still worked it out

5    with the bank.  RC still had good relationships with

6    them.  They haven't come after him on a lot of those.

7              In terms of the fraud cases, because

8    those are the most important that I know you want to

9    address.  Out of all those cases, there was three --

10   there's three lawsuits that allege fraud.  One -- one

11   was a partnership, that was the SR20 case, and that

12   was settled immediately.  They've been -- that case

13   has been dismissed.  There was a fight over the value

14   of a property and we settled that one.

15             There are two pending fraud cases right

16   now, one is Prakash Patel.  He's RC Patel's

17   brother-in-law.  He wrote a letter to Your Honor.

18   Prakash was a -- was a resident of -- a citizen of the

19   UK.  RC brought him over here to help him get a job.

20             Got him a job on his one project called

21   the Carnegie Hotel project.  Also helped with his

22   brother-in-law's visa.  There were talks about giving

23   the brother some ownership in the company.  Never

24   written down, no operating agreement.  In the hotel.

25             Hotel sells.  RC escrows $700,000 for

1    Prakash Patel.  Prakash wants a million, and that's

2    how this whole dispute started.  My firm was entrusted

3    with the $700,000.  The lawsuit, that lawsuit actually

4    is just a motion to enforce settlement agreement

5    because we had a settlement agreement that we were

6    going to pay him over time.  And there was some

7    allegations of fraudulent transfer.

8              We settled that.  We paid Prakash

9    $700,000 in exchange for releases, because what

10   Prakash did is he brought in RC's wife, his kids, his

11   companies.  And this -- and this was a tactic that was

12   used to force the settlement.  There was -- it was

13   paid the 700,000 for the releases.

14             The only aspect that was left was a

15   $500,000 note that RC guaranteed to pay back in three

16   years.  And that wasn't paid back in three years.  RC

17   doesn't have the money.  So he filed a new suit.

18             And guess what?  They sued RC's wife,

19   brother, nephews, kids, done everything all over again

20   as a tactic to try to get paid.  So that suit,

21   Your Honor, is simply just a suit on note case.

22             The other suit is the Paresh Patel case

23   in which Paresh also sent you a letter.  This case,

24   Your Honor, was filed --

25             THE COURT:  Wait a minute.  You just said

1  that the brother-in-law was Paresh.

2          MR. KNIGHT:  That was Prakash.

3          THE COURT:  Oh, Prakash.

4          MR. KNIGHT:  Prakash.  So that's the case

5  where we've paid $700,000, we've got releases, we

6  didn't pay back a note, but that's all the case --

7  it's only a note case, it's not a fraud case.  Which

8  this was just filed, Your Honor, in -- a couple months

9  ago, so we're dealing with that.  We're going to be

10  filing a motion to dismiss on Wednesday.

11          The other case, Your Honor, is Paresh

12  Patel.  This one is frivolous.  It's already been

13  dismissed once by Steve Jones in the Northern District

14  of Georgia.  He alleges that in 2008 his mother made

15  an investment into a hotel deal, $400,000 investment.

16  RC over the last 10 years paid back that loan, paid

17  back over $500,000.

18          The mother passed away in 2009, and the

19  son, Paresh Patel, he asserts a fraud claim.  Steve

20  Jones, Judge Jones, dismisses the case, says you

21  cannot assign fraud claims.  Your mother who passed

22  away can't assign you a fraud claim.  Plus you're out

23  of statute of limitations.

24          This alleged misrepresentation happened

25  in 2002, and you're outside the statute of

1   limitations.  So Judge Jones dismissed it.

2   11th Circuit, we go to argue it in the 11th Circuit.

3   11th Circuit says, well, the trial court, there was a

4   motion to amend the complaint that the trial court

5   never addressed.  So 11th Circuit punted and said,

6   we're going to grant that motion and allow you to

7   amend your complaint.

8            They've amended that complaint, we filed

9   the same motion again, it's still pending.  Those are

10  the only two fraud cases, Your Honor.

11           THE COURT:  What about the letter

12  alleging another case by Rishi Kapoor, Coconut Grove,

13  Florida?

14           MR. KNIGHT:  And that's the Rishi Kapoor

15  case.  That was the only case that I was not -- that I

16  didn't work on, but I do know the facts of that case.

17  And in that case there's already -- Rishi Kapoor

18  already has a judgment against RC in that case.

19  There's already a judgment issued.  So that case is

20  over.  But, Your Honor, that is the one case that I

21  did not work on.

22           THE COURT:  Okay.  All right, thank you.

23           MR. KNIGHT:  Thank you.

24           THE COURT:  All right.  Mr. Garland, are

25  you next?

1          MR. GARLAND:  I'm next, and I will be

2     quite brief.  What I would like to do, may I talk from

3     here, Your Honor?

4          THE COURT:  Why?  Because you need to see

5     the audience?  Okay.  That's fine.

6          MR. GARLAND:  What I would like to do is

7     to introduce, without them addressing the Court, the

8     various people that are here.  And make a brief

9     comment first about the son who was mentioned.

10          THE COURT:  Mel?

11          MR. GARLAND:  Mel.  Mel could not be

12     here.  Mel was born with a neurological condition and

13     has had extraordinary family support, principally from

14     RC.  And the rest of the family, but he's been

15     critical, along with his wife.

16          They got education for him under

17     extraordinarily difficult circumstances, and he did

18     marry, but his neurological condition caused that

19     marriage to fail within shortly over a year, 14

20     months.  And she has left and no longer lives in the

21     home.

22          So it is a real condition and it's not

23     something that -- we would ask the Court to take it

24     into consideration with everything else.

25          THE COURT:  Let me -- there was one of

```
1   these letters which mentioned -- I'll just tell you
2   who it is.  Mukesh Desai said that -- and I don't know
3   where he lives.  I guess he lives in this area.  He's
4   got a 615 area code.  He says his eldest son Jay,
5   middle son Mel and youngest son, Sonial, are all
6   successful individuals.
7               MR. GARLAND:  Well, it's certainly true
8   of the other two.  And in respect to RC's efforts to
9   create that vision of his son in his son, I think what
10  we have presented is an accurate description.  And may
11  I have just a moment?
12              He is successful in that even with the
13  neurological condition he works in one of the hotels.
14  So I think you would say within the context of his
15  capacity.  The other two sons certainly are successful
16  entrepreneurial, honest businessmen.
17              So his friends who are here -- first I'd
18  like to introduce the family with the exception of his
19  son, who couldn't be here today.  We have first his
20  wife.  Would you stand.
21              THE COURT:  Yeah, would you stand so I
22  can see you when he introduces you.
23              MR. HARDIN:  Ms. Shama Patel.  We also
24  have present one of his three sons, Jay Patel.  And
25  Sonial Patel.  We have his sister, Tanu Patel.  I got
```

1    the name wrong.

2              THE COURT:  Okay.

3              MR. GARLAND:  Your Honor, many of them

4    are Patels.  Alka is her first name.  The one I

5    introduced as a sister, in fact, is a cousin.

6              THE COURT:  The one in the front row?

7              MR. GARLAND:  Yes.  And the one in the

8    back row is his youngest sister.  Sam Patel is his

9    brother.  And Asvin Patel, his cousin.  Those are the

10   family members that are here today, Your Honor.

11             There are -- the rest are friends that

12   come out of his charitable work, his community work,

13   and his work in hotels and real estate development.

14   He has owned and developed over 125 hotels, as well as

15   created the first Indian bank in Georgia, the second

16   one in America.

17             So that's where the friends come from,

18   and they are from all over.  As Your Honor knows, he

19   lived here in Nashville for a while or adjacent to

20   this community.  And so from Atlanta, we have Debbie

21   Barber, the director of the Youth Ensemble of Atlanta,

22   who has known him for many years.  I know you're

23   familiar with that.

24             THE COURT:  Looks like there's lots of

25   talent in that group.

1          MR. GARLAND:  And she has brought with

2    her some of the young people who know Mr. Patel, that

3    work with him.  And they insisted on coming to show

4    their support.  Thank you.

5          Next I'd like to introduce Bobby Patel.

6    Mr. Bobby Patel is from here in Nashville -- excuse

7    me, I've got my cities wrong.  It's Atlanta.  He is

8    the head of the Indian Temple in Atlanta and that is

9    in the Ishmaili community -- wait, this is in the

10   Hindu community.  All right.  Then -- thank you, sir.

11         Then we have Riaz Ali who is here.  He's

12   the Ishmaili Temple and community of Atlanta.  That is

13   some 10,000 people in the Atlanta area.  Thank you.

14         We have Gary Lambert, from the Middle

15   Tennessee Mission Organization of Springfield,

16   Tennessee.  He is a person who leads humanitarian

17   efforts and he's on the video and you've heard from

18   him.  Thank you.

19         We have Hina Patel, a close family

20   friend, who has come.  Friends of the entire family

21   from Atlanta.  We have King Patel, a friend from

22   business in the motel business.  He is from Maryland

23   and he's come here to show his presence.

24         We have Manish Patel.  He is a friend

25   from Pennsylvania who has driven down to show his

1    support.  We have Anila Patel, a friend from

2    New Jersey.  We have Bipin Das.  Mr. Das has been a

3    friend since he was in kindergarten in London, and he

4    has come to show his support.  He now lives, I

5    believe, in Ohio.

6              We have Autul Gordon, a friend from here

7    in Nashville -- he's not here, excuse me.  We have

8    Mukesh Desai, a friend from here in Tennessee.  We

9    have Bimal Patel, he's from here in Tennessee.  We

10   have Denny Painter, an attorney and friend from

11   Atlanta.  And we have Melanie Hamed -- she's not here,

12   okay.  Excuse me, Your Honor.

13             Your Honor has received a letter from

14   Doug Collins.  Mr. Collins is here.  Mr. Collins is

15   formerly the head of two public companies, the

16   Days Inns of America that I'm sure Your Honor is aware

17   of and American Best Franchises.

18             I would just point out that he has known

19   Mr. Patel many, many years, and he knew it -- knew him

20   when Mr. Patel was the driving force and founding

21   member, one of the founding members of the Asian

22   American Hotel Owners of America.  AAHOA is the short

23   pronunciation.

24             That now has over 10,000 members, and

25   they own over 50 percent of all the hotels in America.

1    Mr. Patel has been a leader in the development of

2    that, which has had the positive effects on the lives

3    of thousands of people.  We have Adam Firth -- he

4    didn't make it.

5              Those, Your Honor, are the people who've

6    come in support.  What they illustrate is diversity

7    across America where he has had loyalty developed from

8    these people, and they truly know, you see through

9    their letters, what kind of man he really is.

10              I just want to briefly comment on what my

11   partner said.  When the banks collapsed, Mr. Patel had

12   83 bank accounts from 83 businesses and the world just

13   ended around him.  It was in the context of that chaos

14   when he made the serious error he made.  You've heard

15   the context, it was another business deal.

16              Now, Mr. Kisan wanted to be in business

17   with him because he knew what a wonderful businessman

18   he was.  And the intent was to make a profit for

19   everyone.  I want to point out, when the bank would

20   make a profit, they'd buy these loans, 65 percent of

21   the bank was owned by Mr. Patel and his family.

22              So when it was -- they could mark the

23   loan up, it went to the benefit of the bank and also

24   to Mr. Patel.  They would then go to the person who

25   owed the loan who might have a huge hotel that he

```
 1    owned, couldn't settle -- that person can't settle
 2    with the FDIC because they won't settle with the
 3    person that owes them.  You then go to the person that
 4    owed the note, mark it up, make a profit.
 5              So it was a very legitimate way to do it,
 6    and Mr. Kisan wanted to be part of that.  And that was
 7    what was intended.  It was during this crisis that
 8    this lapse and wrongful conduct took place.  I just
 9    try to put in the context of chaos.
10              And in chaos with the complexity of what
11    was happening around him, with an intent later to pay
12    it back, he found himself making errors that he made.
13                   THE COURT:  Thank you.
14                   MR. HARDIN:  Your Honor, I'll be very
15    brief.  I'd like to call the Court's attention to
16    recommended special conditions that Ms. Landry (sic)
17    has submitted.  In Paragraph 4 -- I'll read it, it's
18    very short -- the defendant shall not manage, solicit,
19    accept or otherwise oversee any investments, payments
20    for investments or capital funding from -- for or any
21    individual or any business entities while on
22    supervised release.
23              I mean, we respectfully submit that that
24    is a little overly broad, and it effectively would put
25    him out of business in trying to pay back all of his
```

1    debts.  And I think -- we're talking about debts,

2    little small thing.  It's interesting to me that he's

3    never filed for bankruptcy, even though he probably

4    should have.  He wants to pay back his debts.  If you

5    give him these -- this prohibition, he'll not be able

6    to do the charity events that he is doing.

7              If you look at what he's done, this man

8    is a one-man Peace Corps.  He's done Little League

9    baseball or sports up here in Goodlettsville, all the

10   way to Honduras and all the way to India.  It's a

11   remarkable -- no matter what else happens in this

12   case, you've got to say the man is remarkable.

13             THE COURT:  Why haven't you objected to

14   this special condition so you-all could have talked

15   about this and tried to figure out what makes more

16   sense?

17             MR. HARDIN:  Your Honor, we probably

18   should have done that.  I, quite frankly, was looking

19   at it a couple of days ago and it jumped out at me

20   that this is something that's very Draconian, and

21   you're absolutely right.  We should have done that and

22   we just didn't do it.  I apologize to the Court.

23             On page 1 of our memorandum, I wrote that

24   it is no easy task for a court to comprehend the

25   defendant that's in front of you.  That's the case

1    here with Mr. Patel.  In any case there's differing

2    opinions.  There's folks here that are highly upset

3    and folks here that love the defendant and stand by

4    him no matter what.

5              I submit to you that in trying to get at

6    the core soul of an individual, we should look more

7    and more to the small things that they do.  As I said,

8    he's never been to bankruptcy, which I find to be

9    absolutely astounding.

10              I never knew Mr. Patel until about four

11    months ago, but I knew his name years ago.  I was in

12    an office in Atlanta, an entertainment lawyer, Jeffrey

13    Smith, and he probably represents more celebrities

14    than any other lawyer in the United States.  And he

15    has all these Grammys on the wall and there's a

16    beautiful picture -- pictures of the Taj Mahal in

17    India.

18              I questioned him, how did you take those

19    pictures there?  They're just phenomenal.  He said,

20    well, I'll tell you.  In idle conversation I was

21    talking to a man named RC Patel, and I said, I'm going

22    to India and I want to take some photographs for my

23    bride.  And that was about the end of the

24    conversation.

25              When he got to India to the Taj Mahal,

1    there's this big sign up there that says Welcome Jeff

2    Smith.  And he was given access -- because of

3    Mr. Patel, given access to areas of the Taj Mahal that

4    I understand nobody's ever been given access to.  He

5    had these phenomenal photographs to give to his wife.

6            And he said -- he said years later, he

7    said, I was campaigning for this Supreme Court Justice

8    in Georgia who was an African-American, who was

9    running against a racist, and they were losing 60 to

10   40.

11           He says he calls Mr. Patel and explains

12   his situation to Mr. Patel, and Mr. Patel organized

13   the Asian population throughout Georgia and the Indian

14   population, and this lady won.  And I thought those

15   were great stories.  I didn't think any more about

16   them, but -- until today.

17           But I think these small stories, these

18   little tidbits give an insight into the soul of this

19   man.  Certainly he's done wrong, there's no question

20   about that.  But how many people appear before you --

21   if you watch that video, and I'm sure you did -- that

22   have such an astounding past and such astounding

23   deeds.  They were done long before this, not in

24   preparation to appear before Your Honor.

25           For these reasons, we ask that he be

1   given probation and allow him to pay back to the

2   community instead of having to pay it back to a

3   federal penitentiary.  Thank you, Your Honor.

4             THE COURT:  Thank you.

5             Mr. Patel, you have the opportunity to

6   address the Court and tell me anything you want me to

7   hear before I sentence you.

8             THE DEFENDANT:  Yes, Your Honor.

9             THE COURT:  Okay.

10            THE DEFENDANT:  Good afternoon,

11   Your Honor.  I am not a public speaker, but I would

12   like to express some of my feelings, if I may.  It is

13   very humbling experience to appear before you today

14   and appear before my family and my friends and

15   business colleagues, something which I thought I would

16   never have to do.

17            The most overwhelming emotion I feel

18   right now is gratitude for these people who have come

19   here who have been here to support me.  For the past

20   couple of years since this criminal case started there

21   have been many, many times when I thought I had no

22   friends, no support, and there have been many times

23   when I was alone and scared.

24            I unwillingly hurt everyone, especially

25   those who are important to me.  Today I realize that I

have a lot of friends, though I certainly don't
deserve all the kind things they've said about me, and
I've obviously let them down by my behavior in 2008.
Knowing that I had these friends and family with me
means more than I could possibly tell you.

The decisions I made in 2008 during those
terrible chaotic days in 2008 and early 2009 were
terrible decisions. After spending years, in fact,
decades, building several businesses, including
hotels, banks, and other stable and successful
businesses, over the course of a few months I
experienced what so many other businesses experienced
when the market crashed.

And my response was wrong. It was very
wrong. My decisions were terribly flawed. Not a
single day goes by as this day is always on my mind.
I look back in trying to figure out why my instincts
went astray. Why was it that my initial quick
decision was to take money from Mr. Kisan. And use it
to deal with another problem.

I know that at the time I was thinking,
no problem, I will just need to borrow the money for a
short time, and then I can give the money back to him.
That is what I was thinking. It is very foolish
mistake. And I was put in a corner. But it is not an

excuse for what I did.  My instincts do -- my
instincts to do the right thing deserted me.  What I
did was wrong, very wrong.  I would like to put this
episode behind me.

I have learned greatly from this
experience.  And I would like to start to rebuild my
reputation, which will take time.  And though I have
all these people and family to support me, I know this
is my responsibility to start the process of
rebuilding my reputation on my own.

Thank you, Your Honor, for your time.

THE COURT:  Mr. Abely?

MR. ABELY:  I just wanted to clarify one
issue, Your Honor.  I want to apologize for
misspeaking earlier about the date of the settlement
agreement and thank Mr. Samuel for correcting me.

And just to clarify further.  I believe
that the parties settled that civil suit in South
Carolina in April of 2014.  Mr. Patel was indicted in
this case in May of 2014.

But I would just note to the Court that I
was in discussions with Mr. Samuel and Mr. Garland
about this case back in the 2013.  And, indeed,
Mr. Patel had executed a tolling agreement tolling the
criminal statute of limitations back in October of

1   2013.  So he was certainly aware of the criminal

2   investigation prior to the settlement, but I did

3   misspeak when I said that the settlement came after

4   the indictment in this case.

5           THE COURT:  Okay.  Mr. Abely, you are

6   asking for 18 months' time?

7           MR. ABELY:  Yes, Your Honor.

8           THE COURT:  In a very -- but you have

9   constricted yourself to a very small piece of this

10  case.  You let him plead to two counts out of 10.  And

11  I'm just wondering if you have any further arguments

12  or justification, in light of everything we've heard

13  today, for 18 months of custody.

14          MR. ABELY:  Certainly, Your Honor.  Let

15  me address that.  First of all, let me just say, 18

16  months is a -- is a significant sentence.  It is a

17  below-guideline sentence in this case.  And I think

18  that recommendation took into account, as I said

19  before, the letters, the support that Mr. Patel

20  clearly has from his friends and family and community,

21  the various and undoubtedly positive tidbits that

22  Mr. Hardin spoke of.

23          $500,000 is not the biggest fraud in the

24  world, but it's a lot of money.  And I think for an

25  individual like Mr. Kisan who's here, that is --

1    again, this isn't money taken from a bank or a
2    government program that has bottomless or near
3    bottomless reserves.  This is an individual, a human
4    being.  Those of us who work hard every day I think
5    understand how much money that is to your average
6    person.
7                That is an unfathomable amount of money,
8    and I'm not saying that Mr. Kisan -- you know, I don't
9    know too much about his -- his net worth or anything,
10   but I feel very comfortable suggesting that $500,000
11   is absolutely a lot of money for him.
12               THE COURT:  Well, and his -- his
13   restitution statement indicates he's out a whole lot
14   more than $500,000 as a result of this dispute.
15               MR. ABELY:  Yes, it does.
16               THE COURT:  Which you have said he's not
17   entitled to.  Or probation office has said he's not
18   entitled to that additional I believe $880,000 that
19   he's requesting.
20               MR. ABELY:  Yes, Your Honor.  Although --
21   and there's a matter of law and there's the statute,
22   but in terms -- and that is obviously what the Court's
23   confined to in terms of restitution.  But in terms of
24   harm here, I think that is -- that is fair game.
25               And I think it's -- and Mr. Kisan's also

1    expressed the toll it's taken on him mentally and in
2    terms of distraction, spending time away from his
3    family and his other pursuits and all that.  And I
4    certainly don't dispute that at all.  I'm sure that's
5    all 100 percent correct and certainly the Court can
6    factor in.
7              But then at the core of this is $500,000.
8    That money was Mr. Kisan's by right and law.  And,
9    Mr. Patel, as he's candidly admitted today, had a
10   lapse in judgment and wrongly took that money and used
11   it for other purposes.
12             So my recommended sentence, Your Honor,
13   is really largely based on that conduct.  I think that
14   is serious conduct.  I think it's something that does
15   need to be deterred.  And, you know, a lot of times in
16   these types of white collar cases when we have an
17   individual who has -- and I don't dispute, you know,
18   lived in many ways, apart from this instance, an
19   upstanding and productive life, a lot of times you
20   have the argument that it was an aberrant activity.
21             And I know a lot of what we're focusing
22   on here is things that happened over a relatively
23   short period of time, December 2008, January 2009.
24   That is why one of the things I wanted to call
25   Your Honor's attention to in my sentencing paper was

```
 1   this deposition in I think it was May of 2011, so I
 2   think that's two and a half years afterwards, where
 3   Mr. Patel is still sort of coming up with an alternate
 4   and untrue version of events whereby, you know, the
 5   reasons that this deal didn't go forward were
 6   something other than just the mere fact that he didn't
 7   win the bid.
 8           He had no right, even on the day that
 9   Mr. Kisan paid the money -- and I'm not saying that
10   Mr. Patel knew this or not, but the auction had
11   occurred, he had not won, the deal was never going to
12   go forward.  So, you know, it's more than just a lapse
13   of judgment in December 2008 and January 2009.
14           I think it goes forward into that period
15   as he continued the misrepresentations.  I know these
16   things are not formulaic and it's not an easy task for
17   the Court to balance what I'm sure the Court sees as
18   serious misconduct with what Mr. Patel's lawyers have
19   today I think very effectively presented as some of
20   his attributes.  And it's --
21           THE COURT:  You're glad you're not the
22   judge, aren't you?
23           MR. ABELY:  On many occasions,
24   Your Honor.  On many occasions.  And so I don't think
25   I can justify my recommendation any more than I have.
```

1     Otherwise -- other than to say I think the attributes

2     and various mitigating circumstances the defense has

3     effectively articulated today, acknowledging that

4     justifies a below guideline sentence.

5           But it's my position, specifically the

6     government, that the conduct at issue here is -- the

7     misconduct is serious enough to -- to merit a sentence

8     of imprisonment and one that's sufficiently lengthy to

9     adequately deter this type of behavior.

10           THE COURT:  Okay.

11           MR. ABELY:  Thank you, Your Honor.

12           THE COURT:  Anything else from the

13     defense?

14           MR. SAMUEL:  Your Honor, I don't want to

15     belabor a technical point, but it's true the auction

16     occurred before the money was wired.  But everybody

17     agrees, nobody at High Trust knew that they hadn't won

18     the bid.  Mr. Blackman is absolutely clear about that.

19     He testifies about that.  He answered my questions

20     about that.

21           The knowledge that they hadn't won the

22     bid didn't occur for another week or so.  I don't know

23     if you caught Mr. Abely saying that.  He's factually

24     right, but the significance of it is minimal because

25     Debt-X doesn't tell the losers of the bid that you've

1    lost the bid.  They just send something out in the

2    mail in about a week or 10 days.

3              THE COURT:  I guess I'm missing

4    something, then.  You're saying that this defendant

5    didn't know --

6              MR. SAMUEL:  He didn't know.

7              THE COURT:  -- that they had not gotten

8    the bid?

9              MR. ABELY:  Yeah, I'm not disputing that.

10   And so to Mr. Samuel's point, I agree with Mr. Samuel.

11   This is not something of significance here.  I think

12   what Mr. Samuel's pointing out is a factual matter.

13             The auction happened before Mr. Kisan

14   sent his money.  I think what Mr. Samuel is saying is

15   that that's really neither here nor there because at

16   the time Mr. Kisan gave the money, Mr. Patel did not

17   know whether or not he'd won, and I agree.  I agree

18   with that.  I certainly can't disagree with that

19   statement.

20             THE COURT:  Okay.  But the fact remains

21   he very quickly sent the money off to some other

22   purpose.

23             MR. SAMUEL:  No doubt about that.

24             THE COURT:  All right.  The Court's.

25   obligation is to impose a sentence that is sufficient

1   but not greater than necessary to comply with the

2   purposes of the sentencing statute, taking into

3   account the nature and circumstances of the offense

4   and the history and characteristics of the defendant.

5             The sentence is supposed to reflect the

6   seriousness of the offense, promote respect for the

7   law, provide a just punishment for the defense,

8   protect the public from further crimes of the

9   defendant, and avoid unwarranted sentencing

10   disparities among defendants with similar records who

11   have been found guilty of similar conduct.

12             The guidelines were put into place in the

13   mid '80s because someone charged with a marijuana

14   offense in Nashville might get three years out of a

15   federal court and someone charged with the same

16   offense up in New York City might get two months.

17             And Congress decided that we needed to

18   have more uniformity in sentencing so that, in federal

19   court at least, people charged with the same crime get

20   basically the same sentence.

21             That, of course, doesn't take into

22   account that people are different and our sentencing

23   also needs to be individualized, but the sentencing

24   range, which in this case is 21 to 27 months, that is

25   the advisory guideline sentence, taking into account

1    the offense -- the offense is -- points are assigned

2    based on various aspects to the offense.

3              And then you factor into the offense

4    level the criminal history category.  Mr. Patel has no

5    criminal history, so he's in Category I.  And so that

6    results in the guideline range of 21 to 27 months.

7              To avoid unwarranted sentencing

8    disparities, I have to start with that guideline range

9    when I am considering what sentence to give this

10   defendant, because the system of uniform sentencing

11   has come up with that sentencing range, given the

12   aspects of this offense, how many victims there were,

13   what the harm was, what the loss was, whether other

14   people were involved, all that sort of thing, to come

15   up with the points here.

16             So I just want people, most of whom in

17   this room are not familiar with federal sentencing, I

18   want to try to give you that little sketch of the

19   considerations that I must look at when I am

20   sentencing people.

21             In terms of the nature and circumstances

22   of the offense in this case, Mr. Patel has pled guilty

23   to two counts of wire fraud, taking place over the

24   course of about three months in 2008 and 2009

25   involving the transfer of $500 -- $500,000 from

Mr. Kisan, who is here today as the victim of this

offense, who was a long-term friend of Mr. Patel, who

wanted to become involved in an investment opportunity

with him.

He sent $500,000 to Mr. Patel. He wired

that money in order to receive a 14 percent share of a

mortgage that was to be purchased on a hotel property

in Atlanta. That was what he was promised. He wired

the money.

Mr. Patel, who needed it for another

purpose, promptly used it to pay off a personal,

unrelated obligation of his, and then proceeded to lie

to Mr. Kisan about what had happened at the auction

and what happened to his money.

He did, in fairly short order, however,

tell him that he knew he owed him the money. He

apparently did not pay him the money for enough time

to hold Mr. Kisan off, and Mr. Kisan sued him in a

civil suit. And that civil suit settled after

Mr. Patel knew there was a criminal investigation

involving this matter but before he was indicted.

The Court considers this a serious

offense. It caused a lot of harm to Mr. Kisan, who

has detailed that for the Court in his victim

statement, where he requested additional funds that he

1    considers legitimate harm from this crime.

2             He details a request for some, I believe

3    $880,000.  He is not technically entitled to that

4    amount of money, but that is -- that certainly can be

5    considered as additional harm from this crime.

6             $500,000 of that is attorney's fees and

7    expert fees, $240,000 in lost interest at 8 percent,

8    travel expenses and lost income at other businesses

9    and the lost opportunity to invest this money

10   somewhere else.  He asserts that he and his attorneys

11   did lots of investigation over six years involving

12   this fraud and that it caused him physical and mental

13   stress.

14            I don't have any reason to doubt that.

15   It hasn't been countered.  It's part of the record, so

16   if there was very much to counter this, I guess I

17   would have been told about it.  And I haven't been

18   told about it.

19            In terms of the history and

20   characteristics of Mr. Patel, he is 56.  He is Indian,

21   born in Uganda.  He apparently was ousted from Uganda

22   at some point and moved with his family to England

23   when he was 10.  His parents worked hard there.  At 21

24   I guess they stayed in the UK and Mr. Patel came over

25   here.

1          He's lived in several cities in the
2     United States, built up a very successful business
3     career for himself.  He's married.  He has three sons.
4     They all live with him and they all participate in his
5     business, business endeavors.
6          One has some developmental issues, but he
7     does work and is self-sufficient in terms of not
8     needing to be having care on a daily basis.  He takes
9     care of himself, but he does have developmental delays
10    of some sort.
11         Mr. Patel has some health issues.  He has
12    been a very successful hotel executive, has millions
13    of dollars of assets and millions of dollars of net
14    worth.  Lives in a very, very valuable house.
15         His lawyers have done an excellent job of
16    giving me a full picture of Mr. Patel's life and his
17    good works.  I do need to say he's a US citizen.
18    Became a US citizen in 2005; is that right?
19              THE DEFENDANT:  Yes, Your Honor.
20              THE COURT:  2005 became a US citizen.  He
21    has been very active in his community.  He has done
22    individual acts of great kindness and great charity to
23    many, many people who have written many, many letters
24    furnished to the Court, and lots of those people are
25    here.

1          He has started nonprofits, he's started

2     apparently the first Indian bank in Georgia that I'm

3     sure was a benefit to his community.  He has engaged

4     in a lot of nonprofit activity that's been very

5     beneficial to his community and to individuals.

6          And people from the youth ensemble of

7     Atlanta are here, their director and some of the

8     children participating, particularly touching endeavor

9     that he's been very involved; the Honduran efforts,

10    and they have a representative here as well, the man

11    that helps with that.

12          So a very impressive record of good

13    works.  And as Mr. Hardin ably pointed out, these are

14    not good works that all of a sudden started after he

15    knew that he was a subject of a criminal

16    investigation.  These are good works that Mr. Patel

17    has engaged in for his entire life in the

18    United States and probably elsewhere.  And that is a

19    very impressive record.

20          I am considering all of that in my

21    sentencing.  I do not see it as a deterrent to jail

22    time, any kind of family circumstances.  Mr. Patel has

23    two very able, smart sons working in his business who

24    live with him.

25          And any health issues that his mother has

1    or that the middle son has, in the Court's view, can

2    be well taken care of by the other members of the

3    family.  So I don't see that as any kind of problem

4    for imposing the jail time that the government is

5    requesting.

6              I certainly am considering that Mr. Patel

7    has no criminal record.  I am considering that this

8    offense happened at a time when lots of people -- a

9    lot of people were not exercising good judgment

10   because of the bank and mortgage failures in this

11   country.

12             That is not an excuse, but it sets the

13   stage for why someone who apparently has not engaged

14   regularly in fraudulent transactions would engage in

15   this one.  And the -- I was glad to have the

16   additional background on all of the lawsuits that have

17   been brought to the Court's attention.

18             As Mr. Samuel pointed out, Mr. Abely is

19   a -- he's what I call a compassionate prosecutor, as

20   Mr. Hardin was and as I think I was, which is what I

21   think is appropriate.  I think that his good judgment

22   is reflected in the plea agreement.  I think that

23   allowing Mr. Patel to plead to two counts and

24   dismissing eight shows his evaluation of the facts.

25   He knows the facts of all 10 of these offenses, and

1   the Court does not.

2            But he also, in his good judgment, is

3   requesting significant jail time.  It's not

4   significant jail time in this court, believe me,

5   folks.  18 months is not significant jail time.  It

6   certainly would be significant jail time to this

7   defendant and to the other people sitting in this

8   courtroom.

9            Again, my job must take into account not

10  just what a wonderful man Mr. Patel is to his family

11  and community and friends and associates, but the

12  offense itself.  And my sentence must reflect the

13  seriousness of the offense, promote respect for the

14  law, not just by Mr. Patel, but for people in the

15  community who hear about this offense and what

16  happened to Mr. Patel as a result of this offense.

17  And be a just punishment and avoid unwarranted

18  sentencing disparities.

19            And so the Court feels that a prison term

20  not of lengthy duration must be imposed in this case.

21  And so my sentence is going to be six months in the

22  custody of the Bureau of Prisons followed by two years

23  of supervised release.

24            I also am levying a $50,000 fine.  He

25  must pay the $200 special assessment.  No restitution

1    is due.

2              The special conditions of his supervised

3    release are he is prohibited from owning, carrying or

4    possessing firearms, destructive devices or other

5    dangerous weapons.  He's to cooperate in the

6    collection of DNA.

7              He shall pay the fine within 60 days of

8    sentencing.  If it's not paid, the repayment will

9    begin under the Prison Inmate Financial Responsibility

10   program.  And he's to furnish all financial records

11   and tax returns during his period of supervised

12   release.

13             Mr. Abely, do you have a strong

14   investment in Special Condition No. 4 or do you have

15   suggestions for modifying it or revising it in any

16   way?

17             MR. ABELY:  Your Honor, I understand

18   Mr. Hardin's point.  And certainly the intention of

19   any condition should not be to improperly handicap

20   Mr. Patel from earning a living, including --

21   including paying back other debts that he's due.

22             However, I agree with the probation

23   office's recommended condition here.  The period of

24   supervised release is two years, which is not as long

25   as it is in some cases.  And I think in this case it

1  would be appropriate to make sure that as Mr. Patel

2  reenters the business community, that other investors

3  are protected.

4          THE COURT:  Well, he certainly has two

5  sons who could do all this for him, I guess.

6          MR. ABELY:  I won't speak to that,

7  Your Honor.

8          THE COURT:  Okay.  I'm going to leave it

9  in place.  If it turns out to be too much of a

10  hindrance, you can always file a motion to request a

11  modification of it once he's on supervised release.

12  And I will consider that.

13          MR. GARLAND:  May I just briefly address?

14          THE COURT:  Yeah.

15          MR. GARLAND:  If you look at the

16  language, it is extremely broad.

17          THE COURT:  It's the standard language, I

18  presume.  Is it, Ms. Lander?

19          MR. GARLAND:  I don't know about the

20  standard language, but if you read the language, it is

21  so broad as to make -- how -- how can he pay those

22  debts.  How can he solve a problem if he has an asset

23  and he needs to bring people into it, sell part of it,

24  take that money, pay all the people that are owed.  I

25  just -- what it does is it really hurts the creditors

1    that he has.

2              THE COURT:  Why didn't you folks deal

3    with this before today?

4              MR. GARLAND:  Your Honor, we take the

5    blame.  We take the blame.  So many issues and I think

6    we got lost looking at the lawsuits and didn't really

7    focus on that issue.  When I tried to read the

8    language to try to understand, it's what I would call

9    its overbreadth or vagueness, I don't see how he can

10   carry on any kind of business activities.

11             THE COURT:  Well, he's got -- he's got

12   investments that are in his name.  Numerous,

13   apparently.

14             MR. GARLAND:  If you look at this 15,000

15   or so dollars a month in mortgage payments, that

16   anticipates somebody -- in other words, we put a

17   condition on him that causes all kind of damage to

18   other people, and it really hamstrings.

19             Now, I would ask the Court in considering

20   that condition to think about the thousands or tens of

21   thousands of business transactions this man had to

22   have engaged in to assemble and put together 125

23   motels.  Then to sell them, to build banks.

24             Each one of those might have involved 20,

25   40 transactions.  One over a 90-day period in the

1    midst of crisis?  I want to ask you to reconsider that

2    condition.  If he does anything, his supervised

3    release can be revoked.  And he could be prosecuted

4    for it.

5            But this type of condition is more suited

6    to a banker who is still in the banking business or

7    securities dealer or a special kind of situation.  But

8    for a person who has a diversity -- and who's got --

9    he's going to have to go to his friends over the years

10   and say, help me be able to meet these problems.

11           And we have some consent judgments.  I

12   don't know if they've all been assembled yet or the

13   status.  He has not gone bankrupt, but if he can't do

14   anything, that provision, I think, puts him in

15   bankruptcy.

16           So if you look at it -- if you had tens

17   of thousands of transactions and not a finding, no

18   other criminal warrant, not a judgment predicated on

19   fraud, a claim --

20           THE COURT:  I don't know about whether

21   there are any judgments predicated on fraud.  That I

22   don't know.  I see a lot of multimillion dollar

23   judgments that might or might not arise out of

24   lawsuits that alleged fraud.

25           MR. GARLAND:  I can't fully answer that

1    because all of this kind of fluttered in here --

2                    THE COURT:  Does anybody have a

3    suggestion about how to make it less Draconian?

4                    MR. HARDIN:  Well, I have one,

5    Your Honor.  It really worries me, it says "or

6    otherwise oversees any investment."  I can foresee a

7    situation where his sons maybe are picking up the

8    mantle and going forward with it, but he could easily

9    be accused of overseeing it if he gives any advice.

10   It's just so broad.

11                   THE COURT:  Yeah.

12                   MR. HARDIN:  The most Draconian is

13   otherwise oversee, to me.

14                   MR. ABELY:  And, Your Honor, in light

15   of -- Mr. Hardin said, I think, overbreadth, I think

16   Mr. Garland said vagueness.  I can see that in -- to

17   be candid, in the terms otherwise oversee, as well as

18   manage.  I think perhaps if the Court were to consider

19   modifying this condition, to leave the operative verbs

20   as being solicit or accept.

21                   I think that really would go to

22   protecting potential investors while hopefully not

23   hamstringing his ability to manage businesses that

24   he's already involved in.

25                   MR. GARLAND:  We can certainly live with

1    that proposed modification, Your Honor.  We'd ask the

2    Court to --

3              THE COURT:  You think you can?

4              MR. GARLAND:  We think we can.

5              THE COURT:  All right.  So shall not

6    solicit or accept any investments, payments for

7    investments or capital funding --

8              MR. GARLAND:  I don't think we can live

9    with the rest of that.  If he's not out soliciting

10   investments and accepting investments, but if he has

11   payments coming in from prior investments, sells

12   something and the money comes back, we would just ask

13   you to limit it, shall not solicit or accept any

14   investments from -- let's see -- any individual or

15   business entities.  I think that will do it.  Am I

16   correct?  I'm not a contract lawyer, so.

17             THE COURT:  Defendant shall not solicit

18   or accept any investments from any individual or

19   business entities while on supervised release.  Are

20   you saying you can live with that?  Does Mr. Patel

21   think he can live with that?

22             MR. GARLAND:  Yes, he can.

23             THE COURT:  Okay.  So that will be -- is

24   that acceptable?

25             MR. ABELY:  It is, Your Honor.  I'll just

1    toss this out there, that the probation officer has I

2    think -- an alternate would be to make any of this

3    type of activity contingent on notification of the

4    probation office, which would be another way to do it.

5                   I personally think that narrowing this

6    such that it just applies to the solicitation or

7    acceptance of investments is sufficient to meet the

8    needs that I was --

9                   THE COURT:  I do too.  I think it's way

10   too complicated to let the probation office know about

11   those things.  So 4, as modified.

12                  MR. GARLAND:  Your Honor, we would like

13   to seek the recommendation of the Court that he be

14   confined in the Atlanta camp located in Atlanta.

15                  THE COURT:  Atlanta prison camp?

16                  MR. GARLAND:  Yes.  It's located adjacent

17   to the Atlanta prison.

18                  THE COURT:  All right.  I'll recommend

19   that.  You know they do what they wish --

20                  MR. GARLAND:  I know they do.

21                  THE COURT:  -- but I will make the

22   recommendation.  I presume he would like to

23   self-report in 60 days or so?

24                  MR. GARLAND:  We would also request that,

25   Your Honor.

1              THE COURT:  60 days?  60 days?

2              MR. GARLAND:  60 days would be adequate.

3              THE COURT:  All right.  Self-report by

4    Wednesday, May 18 at 2 o'clock to wherever you are

5    designated, Mr. Patel.  And I have to tell you that

6    your failure to promptly report is another federal

7    offense.

8              Does anyone have objections to my

9    sentence that have not previously been raised?

10             MR. ABELY:  Not the government,

11   Your Honor.

12             MR. SAMUEL:  No, Your Honor.

13             THE COURT:  Can the J&C reflect that you

14   do not object to my variance?

15             MR. ABELY:  Yes, it may, Your Honor.

16   Thank you.

17             THE COURT:  Mr. Patel, to the extent you

18   retained your right to appeal in your plea agreement,

19   any appeal must be filed within 14 days.  You may

20   apply to appeal under the pauper's oath if that is

21   appropriate and the clerk will file your notice of

22   appeal if you request the clerk to do so.

23             You must comply with the conditions of

24   your release until you report to serve your sentence.

25   I want to thank all your family, friends and

1    associates for coming today and helping to give the

2    Court a view of you as a person.  It was helpful.  Is

3    there anything else on this case?

4              MR. ABELY:  No.  Thank you, Your Honor.

5              THE COURT:  All right.  We're in recess.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE PAGE**

2

3          I, Roxann Harkins, Official Court Reporter

4    for the United States District Court for the Middle

5    District of Tennessee, in Nashville, do hereby

6    certify:

7              That I reported on the stenographic machine

8    the proceedings held in open court on March 18, 2016,

9    in the matter of UNITED STATES OF AMERICA v. R.C.

10   PATEL, Case No. 3:14-cr-00082-1 ; that said

11   proceedings were reduced to typewritten form by me;

12   and that the foregoing transcript is a true and

13   accurate transcript of said proceedings.

14

15             This is the 11th day of April, 2016.

16

17                       s/ Roxann Harkins_____
                         ROXANN HARKINS, RPR, CRR, LCR
18                       Official Court Reporter

19

20

21

22

23

24

25